UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

ANDREA TAPIA and all others similarly
situated, *et al.*,

                Plaintiffs,

       -against-

FIDEL LIRA also known as JESUS LIRA, *et al.*,

                Defendants.
-----------------------------------------------------------x

**OPINION AND ORDER**

18 Civ. 10771 (AEK)

**THE HONORABLE ANDREW E. KRAUSE, U.S.M.J.[1]**

This action was commenced on November 18, 2018, ECF No. 1, and on July 17, 2020,

Plaintiffs Andrea Tapia, Melvin-Israel Garcia-Perez, Carlos Palacios, Rafael Pitalua, Jose

Rodriguez, and all others similarly situated (collectively "Plaintiffs") filed their First Amended

Complaint, asserting claims against Defendants Fidel Lira a/k/a Jesus Lira ("Fidel"), James Lira

("James"), Mary E. Moloney a/k/a Mary Lira ("Mary"), Guadalajara Mexican Restaurant

("GMR"), New Killmallock, Inc. ("New Killmallock"), and Axolotl Ltd. ("Axolotl")[2] for

violations of the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL") based

on the failure to pay minimum wages, overtime wages, and spread-of-hours wages, and the

failure to provide wage notices and wage statements.  ECF No. 47.  Plaintiffs reached a

settlement with Fidel, Mary, and New Killmallock (the "Settling Defendants"), which was

approved by the Court on June 8, 2022.  ECF No. 141.

---

[1] The parties consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c).  ECF
No. 91.

[2] Axolotl Ltd. is incorrectly sued herein as Axoltl Inc.  *See* ECF No. 84.

The only remaining claims in this action are against the non-settling defendants—James, GMR, and Axolotl (collectively, "Defendants")—for alleged wage and hour violations that "were incurred while Mary owned GMR."  ECF No. 152 ("Pls.' Mem. in Opp'n") at 1. Defendants can only be liable if they are considered successors-in-interest to the Settling Defendants for purposes of the violations that allegedly took place during the period of Mary's ownership of GMR.  Currently before the Court is Defendants' motion for summary judgment. ECF No. 144.  For the reasons that follow, Defendants' motion is GRANTED, and the action is dismissed with prejudice.

## BACKGROUND

### I.     Factual Background

The following are facts relevant to the Court's decision.  They are undisputed, unless otherwise noted, and are taken from Defendants' Local Civil Rule 56.1 Statement of Undisputed Material Facts, ECF No. 149 ("Defs.' 56.1 Statement"), Plaintiffs' Reply to Defendants' Rule 56.1 Statement of Undisputed Material Facts, ECF No. 156 ("Pls.' Resp. to Defs.' 56.1 Statement"), and the evidence submitted in connection with Defendants' motion and Plaintiffs' opposition.

GMR is a restaurant located at 2 Union Street, Briarcliff Manor, New York.  Pls.' Resp. to Defs.' 56.1 Statement ¶ 6.  Mary, through her wholly-owned corporation New Killmallock, owned GMR from 2014 through 2018.  ECF No. 147 ("James Decl.") ¶ 2.  James is the sole shareholder of Axolotl.  Pls.' Resp. to Defs.' 56.1 Statement ¶ 7.  James, through Axolotl, is the current owner of GMR.  *Id.* ¶ 8.  Axolotl completed the purchase of GMR from New Killmallock on or around October 1, 2018.  *Id.* ¶ 9; *see* ECF No. 146 ("Tobin Decl.") Ex. N (JL_000033). Plaintiff Andrea Tapia ("Tapia") was an employee of GMR from around May 2017 to July 22,

2018; Plaintiff Melvin-Israel Garcia-Perez ("Garcia-Perez") was an employee of GMR from around May 2017 to March 8, 2018; Plaintiff Carlos Palacios ("Palacios") was an employee of GMR from around February 2006 to around May 2018; and Plaintiff Rafael Pitalua ("Pitalua") was an employee of GMR from around August 2016 to around April 2017.  Pls.' Resp. to Defs.' 56.1 Statement ¶¶ 1-4.[3]

There is no dispute that Plaintiff Jose Rodriguez ("Rodriguez") was an employee of GMR for some period of time after James/Axolotl purchased the restaurant.  *Id.* ¶ 5.  But Plaintiffs note also that Rodriguez was employed by GMR for many years prior to the purchase. *Id.*; *see also* ECF No. 157 ("Rodriguez Decl.") ¶ 3 ("I started working with the Guadalajara Restaurant in approximately 2005, until around November 2018, when I was fired.").  Prior to James's purchase of GMR, Rodriguez served as a manager of the restaurant.  *See* Rodriguez Decl. ¶¶ 4, 6; ECF No. 154 ("Tapia Decl.") ¶ 7; Tobin Decl. Ex. I ("Mary Depo.") at 28:3-22; Tobin Decl. Ex. H ("James Depo.") at 30:19-21.  According to Rodriguez, in that capacity, he was responsible for making employees' work schedules and monitoring their performance. Rodriguez Decl. ¶ 6.  According to Mary, as a manager, Rodriguez was responsible for managing and operating all aspects of the business, including dealing with the payroll and hiring all employees.  Mary Depo. at 26:6-7, 27:4-6, 29:20-22, 41:21-42:2; *see also* James Depo. at 35:16-24 (Rodriguez was the general manager; he administered the business, which included

---

[3] Although Defendants cite only the First Amended Complaint as support for these facts, they are undisputed by Plaintiffs, except that Plaintiffs state, without citation to any evidence, that Palacios had "some gaps in [his] employment" with GMR.  Pls.' Resp. to Defs.' 56.1 Statement ¶ 3.  Plaintiffs' response is supported, however, by the declaration submitted by Palacios in opposition to this motion.  *See* ECF No. 155 ("Palacios Decl.") ¶ 3 ("I worked for the Guadalajara Restaurant on several occasions.  I first worked there from February 5, 2006, to August 7, 2007, as a waiter.  I returned to work with them in the summer of 2011 and worked until 2015.  Finally, I worked from September 2017 to about June 2018.").

handling employee payroll, compensation, and schedules, as well as distributing tips at the end of the night).

The acquisition of GMR by Axolotl from New Killmallock, *i.e.*, by James from Mary, was transacted subject to a Purchase Agreement.  Pls.' Resp. to Defs.' 56.1 Statement ¶ 13; *see* Tobin Decl. Ex. F ("Purchase Agreement").  Defendants aver that James paid Mary $25,000 up front and executed a note for $125,000 as the purchase price for GMR, as set forth in the Purchase Agreement.  Defs.' 56.1 Statement ¶ 11; Purchase Agreement § 2.2.  Plaintiffs contend that there is no evidence "that the note was actually paid."  Pls.' Resp. to Defs.' 56.1 Statement ¶ 11.[4]

Section 3.5 of the Purchase Agreement provides as follows:

> Employee Matters.  On or prior to the Closing, Seller will notify all of the employees of the Business that the Subject Assets are being sold to Purchaser.  Seller shall be liable to such employees for all wages, benefits, and other obligations of any kind whatsoever arising prior to the Closing Date and Seller hereby agrees to indemnify, defend and hold Purchaser harmless from and against any and all claims, losses, costs, expenses, judgments and fees, including but not limited to reasonable attorneys['] fees in connection with any claim made by such employees for all wages, benefits, and other obligations of any kind whatsoever arising prior to the Closing Date.

*Id.* ¶ 14; *see* Purchase Agreement § 3.5.

---

[4] Mary testified at her deposition that she could not "confirm the details" regarding what James paid for the restaurant, but that her accountant "would be able to confirm those details" and would have records "regarding compensation that [James] paid for the purchase of the restaurant."  Mary Depo. at 72:4-20.  Plaintiffs' counsel then asked Mary whether she could verify with her accountant that James "actually paid all of the money to you" for the restaurant, and Mary responded that she could.  *Id.* at 73:7-18.  Mary's lawyer stated that he and his client would take that request for information "under advisement. . . . We will find out what was and was not paid."  *Id.* at 73:22-74:2.  No information or evidence regarding what was or was not paid by Axolotl to New Killmallock has been provided to the Court for its consideration in the determination of this motion, and Plaintiffs' counsel never notified the Court of any discovery issue concerning a failure to produce such information.

The parties do not dispute that James worked at GMR for some period of time prior to the completion of his purchase of the restaurant, *compare* Defs.' 56.1 Statement ¶ 15 *with* Pls.' Resp. to Defs.' 56.1 Statement ¶ 15, but they dispute the nature of his role during that time.[5] Defendants maintain that James "was not a part of the management team of the restaurant," "did not learn how the business conducted payroll," "was not involved in payroll distribution or calculation," and "did not investigate how the employees were paid when his sister owned the restaurant." Defs.' 56.1 Statement ¶¶ 15, 17. In contrast, Plaintiffs contend that James was part of the management team, but this response is based solely on James's testimony as to the amount of money he was paid during the time before the deal closed. *See* Pls.' Resp. to Defs.' 56.1 Statement ¶ 15. Plaintiffs provide no explanation as to the import of this fact or how it establishes that James was a manager of GMR. *See id.*

Additionally, Plaintiffs argue that "everything [James] changed on the day he took ownership was something he evaluated prior to taking ownership, which included payroll, pay systems, payroll companies, employee immigration status, and employee pay practices." Pls.' Resp. to Defs.' 56.1 Statement ¶¶ 15, 17. According to Plaintiffs, while James testified that he did not investigate GMR's time and payroll practices prior to taking over, he specifically testified "that upon him immediately taking over the restaurant he put in a new payroll system and time keeping system because he did not like the system that was in place prior to his owning the business, and that he changed the employee pay structure." *Id.* Yet the evidence cited by Plaintiffs in support of these points provides a less clear picture. When asked during his

---

[5] At the time that James worked at the restaurant, he and Mary had already signed the Purchase Agreement, but the transaction had not yet closed. *See* Purchase Agreement (signed on July 31, 2018); James Depo. at 7:12-13 ("I bought the restaurant from my sister on October 1, 2018."), 26:24-27:2 ("I came in August and was there two months right before I took over in October.").

deposition whether he "changed how the employees were paid," James responded, "I couldn't tell you because I don't know how they were paid previously."  James Depo. at 42:20-22.  He further stated that he "determined how to pay [the employees] exactly how I was paid at my previous job.  And I spoke with administration at my previous job and used the same payroll company as my previous job because they were ADP and it was something I was familiar at, of doing the hours and everything like that from my previous job."  *Id.* at 43:1-7.  James later testified that GMR had previously used ADP, but that when he took over, he opened a new payroll account with ADP in Axolotl's name.  *Id.* at 44:19-46:1.

Defendants maintain that no employee ever complained about improper pay practices to James or in his presence during the time that James was working at GMR before taking ownership.  Defs.' 56.1 Statement ¶ 16.  Plaintiffs attempt to dispute this statement by asserting that Rodriguez complained about not being paid vacation time and alleging that Rodriguez was fired by James for these complaints.  Pls.' Resp. to Defs.' 56.1 Statement ¶ 16.  The evidence cited by Plaintiffs, however, does not support their assertion.[6]

---

[6] Plaintiffs cite exclusively to a declaration from Rodriguez, which states that

> [e]ven when James went to the restaurant to work, his father was in charge of everything.  A few months before I was fired, I asked for a vacation. They gave me the vacation but didn't pay me for it, and when I came back, they seemed to be upset.  A few days later, James Lira fired me.  He told me they already had many people and if I was needed, they would call me.

Rodriguez Decl. ¶ 9.  According to Rodriguez's declaration, he was fired in November 2018, *id.* ¶ 3, and James closed on his purchase of GMR on October 1, 2018, Pls.' Resp. to Defs.' 56.1 Statement ¶ 9.  Thus the timeline of Rodriguez's complaints—termination "a few days later" after returning from vacation—makes clear that the incident in question took place *after* James took over GMR.  Plaintiffs therefore have not pointed to any evidence that any employee ever complained about improper pay practices while James was working at GMR but *before* he took over.

Defendants state that James did not have access to the payroll records of any employee of GMR prior to purchasing the restaurant, Defs.' 56.1 Statement ¶ 18, and that James's accountant, Rosanna Bell—who is also Mary's accountant—never discussed or disclosed any information concerning the financial arrangements of GMR with James prior to the time of the purchase, *id.* ¶ 19. Plaintiffs respond by referencing testimony where James admitted that he looked at the previous years' tax returns and profit and loss statements, but that testimony is not inconsistent with the evidence provided by Defendants on this point. Pls.' Resp. to Defs.' 56.1 Statement ¶¶ 18, 20.[7]

Defendants also contend—consistent with Mary's deposition testimony—that Mary did not discuss with James prior to the acquisition how GMR paid its employees. Defs.' 56.1 Statement ¶ 19. Plaintiffs only attempt to dispute this by pointing to Mary's deposition testimony, in which she confirmed that the attorney who handled the transaction reviewed the language of the Purchase Agreement, including the section regarding unpaid wages, with both Mary and James. Pls.' Resp. to Defs.' 56.1 Statement ¶ 19.[8]

---

[7] In light of James's deposition testimony that he reviewed GMR's profit and loss statements and tax returns, Plaintiffs allege that "Roseanna [*sic*] Bell submitted false testimony to cover for James as a successor by claiming she never provided James with any financial records for GMR." Pls.' Resp. to Defs.' 56.1 Statement ¶ 18. They add that Bell "testified through declaration that she is the GMR accountant and custodian of all financial records." *Id.* ¶ 20 (citing ECF No. 148 ("Bell Decl.") ¶ 3). But there is no such statement in Bell's declaration. All that Bell states in her declaration is that she "did not provide James Lira with any payroll information nor financial arrangements of the restaurant when it was owned by Mary," Bell Decl. ¶ 3, citing James's own deposition testimony. Plaintiffs' counsel never asked James from whom he obtained the P&L statements and tax returns that he reviewed.

[8] In paragraph 19 of their Rule 56.1 Reply, Plaintiffs incorrectly cite Section 3.1 of the Purchase Agreement, but it is Section 3.5 that is referenced in the cited deposition testimony and that relates to New Killmallock's liability for unpaid wages. *See* Mary Depo. at 51:8-23, 54:1-10; Purchase Agreement § 3.5.

Defendants maintain that James did not know how Mary paid Plaintiffs Tapia, Garcia-Perez, Palacios, or Pitalua; that none of these Plaintiffs worked at GMR while James worked there prior to purchasing the restaurant; and that none of these Plaintiffs worked at GMR after James purchased the restaurant.  Defs.' 56.1 Statement ¶ 21.  Plaintiffs admit only that none of them, other than Rodriguez, worked at GMR while it was owned by James; they deny that James did not know how they were paid by Mary based on James's deposition testimony regarding his evaluation of the restaurant while he worked there prior to the purchase.  Pls.' Resp. to Defs.' 56.1 Statement ¶ 21.  The Court cannot discern the evidentiary basis for Plaintiffs' denial of the assertion that none of them, other than Rodriguez, worked at the restaurant while James worked there prior to his purchase.  The latest date that any of the other Plaintiffs claim to have worked at GMR is July 22, 2018, when Tapia's employment ended, and they cite no evidence to dispute James's deposition testimony that he began working in the restaurant in August 2018.  Consequently, it is also unclear what the evidentiary basis is for claiming that James knew how Plaintiffs Tapia, Garcia-Perez, Palacios, and Pitalua were paid by Mary, since none of them were being paid by her when James worked at GMR.

## II.     Procedural History

Plaintiffs initiated this action by filing a complaint on November 18, 2018.  ECF Nos. 1, 4.  In the original complaint, Tapia and Garcia-Perez were the named plaintiffs, and Huaquechula Restaurant Corp. d/b/a Guadalajara Mexican Restaurant, Fidel Lira a/k/a Jesus Lira, and Lucianna Figueroa were the named defendants.  *Id.*  On July 17, 2020, Plaintiffs filed the operative First Amended Complaint, which added Palacios, Pitalua, and Rodriguez as named plaintiffs; dropped Huaquechula Restaurant Corp. (but kept GMR) and Lucianna Figueroa as named defendants; and added James, Mary, New Killmallock, and Axolotl as named defendants.

ECF No. 47.  The various defendants filed their answers to the First Amended Complaint on

August 18, 2020, ECF No. 57 (Fidel); October 21, 2020, ECF No. 68 (James and GMR); and

January 4, 2021, ECF No. 78 (Mary and New Killmallock).  James, GMR, and Axolotl filed an

amended answer to the First Amended Complaint on January 27, 2021.  ECF No. 84.  On June 8,

2022, the Court granted final approval of Plaintiffs' settlement with the Settling Defendants.

ECF No. 141.

On July 29, 2022, Defendants filed their motion for summary judgment.  ECF Nos. 144-

49.  Plaintiffs filed their opposition on October 14 and 15, 2022, ECF Nos. 152-57, and the

motion became fully submitted when Defendants filed their reply in further support of their

motion on November 10, 2022, ECF No. 158.

## DISCUSSION

## I.     Legal Standard for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment must be

granted "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp.

v. Catrett*, 477 U.S. 317, 320-23 (1986).  A dispute about a material fact is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine

issue of material fact exists, a court should "constru[e] the evidence in the light most favorable to

the nonmoving party and draw[] all reasonable inferences in its favor."  *Mount Vernon Fire Ins.

Co. v. Belize N.Y., Inc.*, 277 F.3d 232, 236 (2d Cir. 2002); *Farias v. Instructional Sys., Inc.*, 259

F.3d 91, 97 (2d Cir. 2001); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 764 (2d Cir. 1998);

*see also Anderson*, 477 U.S. at 261 n.2.  A party cannot overcome summary judgment by relying

on "mere speculation or conjecture as to the true nature of the facts" because "conclusory allegations or denials" cannot "create" genuine disputes of material fact "where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quotation marks omitted). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.  In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citations omitted).

## II.    Legal Standard for Successor Liability

"Federal courts sitting in New York employ either a New York common law standard or a 'substantial continuity' test in determining whether a defendant may be held liable for a previous employer's labor law violations." *Moreno v. Ramos*, No. 17-cv-9439 (LTS) (KNF), 2021 WL 637563 at *3 (S.D.N.Y. Feb. 17, 2021); *see Li v. New Ichiro Sushi Inc.*, Nos. 20-1783-cv, 20-1785-cv, 2021 WL 6105491, at *2 (2d Cir. Dec. 21, 2021) (summary order).[9]

"Under both New York law and traditional common law, a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities." *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006).  A buyer of a corporation's assets will be liable as its successor, however, if "'(1) [the buyer] expressly or impliedly assumed the predecessor's . . . liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction

---

[9] The Second Circuit has not yet ruled on the question of which test applies to the determination of successor liability in an FLSA case.  *See Li*, 2021 WL 6105491, at *2.

is entered into fraudulently to escape such obligations.'"  *Id.* (quoting *Schumacher v. Richards Shear Co.*, 59 N.Y.2d 239, 245 (1983)); *see also Xue Ming Wang v. Abumi Sushi Inc.*, 262 F. Supp. 3d 81, 87 (S.D.N.Y. 2017) ("'New York recognizes four common-law exceptions to the rule that an asset purchaser is not liable for the seller's debts, applying to: (1) a buyer who formally assumes a seller's debts; (2) transactions undertaken to defraud creditors; (3) a buyer who *de facto* merged with a seller; and (4) a buyer that is a mere continuation of a seller.'") (quoting *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 (2d Cir. 2003)).[10]

The "substantial continuity" test is broader than the New York/traditional common law test because "unlike the traditional common law test, the substantial continuity test does not require continuity of ownership between the two businesses." *Abumi Sushi*, 262 F. Supp. 3d at 89 (cleaned up).  Under the substantial continuity test, in assessing successor liability, courts typically consider the following nine factors:

> (1) whether the successor company had notice of the charge or pending lawsuit prior to acquiring the business or assets of the predecessor; (2) the ability of the predecessor to provide relief; (3) whether there has been a substantial continuity of business operations; (4) whether the new employer uses the same plant; (5) whether [it] uses the same or substantially the same work force; (6) whether [it] uses the same or substantially the same supervisory personnel; (7) whether the same jobs exist under substantially the same working conditions; (8) whether [it] uses the same machinery, equipment, and methods of production; and (9) whether [it] produces the same product.

---

[10] The New York common law test unquestionably governs Plaintiffs' NYLL claims.  *See Abumi Sushi*, 262 F. Supp. 3d at 88 ("With respect to Plaintiff's pre-sale NYLL . . . claims, this ends the analysis, as the Court is aware of no basis to apply the federal common-law doctrine [of substantial continuity] . . . to claims arising under state law.").

*Id.* (quotation marks omitted).  "As the test has been applied, however, courts have considered the first two factors—notice and the ability of the predecessor to provide relief—to be indispensable."  *Id.*[11]

"Under either test, the party asserting successor liability has the burden of proof." *Moreno*, 2021 WL 637563 at *3.

## III.     The New York/Traditional Common Law Test

Plaintiffs maintain that under the New York/traditional common law test, successor liability attaches to James and Axolotl based on two of the four factors: the express or implied assumption of liability, and the execution of a fraudulent transaction.  Pls.' Mem. in Opp'n at 20-24.  Plaintiffs do not assert the existence of successor liability based on the "*de facto* merger" exception or the "mere continuation" exception, Pls.' Mem. in Opp'n at 20-24; this is understandable, because those factors are plainly inapplicable given the undisputed facts presented here.  "Courts have held that the '*de facto* merger' exception and the 'mere continuation' exception are 'so similar that they may be considered a single exception.'"  *Abumi Sushi*, 262 F. Supp. 3d at 87 (quoting *Cargo Partner*, 352 F.3d at 45 n.3).  "Because continuity of ownership is the essence of a merger . . . , the exception cannot apply in its absence."  *Id.*

---

[11] Plaintiffs cite the case of *Patino v. Brady Parking, Inc.*, No. 11-cv-3080 (DF), 2017 WL 5198192, at *11 (S.D.N.Y. Oct. 31, 2017), which stated that "no one factor is dispositive," *see* Pls.' Mem. in Opp'n at 19-20, in applying the substantial continuity test, and found successor liability for a defendant even though the plaintiff could not demonstrate that the successor had notice of the potential FLSA claims.  But this Court agrees with the courts that have found the first two factors to be "more significant" than the other seven factors.  *See*, *e.g.*, *Diaz v. Slayton One Cleaner Inc.*, No. 17-cv-1311 (LTS) (KNF), 2018 WL 4935831, at *6 (S.D.N.Y. Oct. 11, 2018) ("The *Abumi Sushi* court concluded that holding a successor liable for the labor violations committed by its predecessor when it had no notice of the violations and the predecessor is capable of repairing the harm caused by its past labor practices would be unjust, unnecessary, and needlessly constrict business owners' rights to alienate their assets.  [262 F. Supp. 3d] at 91. This Court concurs in the *Abumi Sushi* court's reasoning and thus recognizes the first two factors as more significant than the others.").

(quotation marks omitted).  Here, Plaintiffs do not dispute that the ownership of GMR changed hands when New Killmallock sold the restaurant to Axolotl.  *See* Pls.' Resp. to Defs.' 56.1 Statement ¶ 23 (Plaintiffs admit that neither Fidel nor Mary "has held ownership, participated in the day-to-day operations of the restaurant, or participated in the financial well-being of the restaurant since James Lira purchased [it].").  Therefore, James and Axolotl cannot be subjected to successor liability on this basis.  *Abumi Sushi*, 262 F. Supp. 3d at 87-88.

With respect to the other two factors, even construing the evidence in the light most favorable to Plaintiffs, James and Axolotl cannot be held liable under the New York/traditional common law test as Mary and New Killmallock's successors-in-interest.

### A.      Express or Implied Assumption of Liability

Plaintiffs argue that James and Axolotl expressly and/or impliedly assumed the liabilities of Mary and New Killmallock pursuant to the terms of the Purchase Agreement, and in particular Sections 3.1 and 3.5 thereof.  *See* Pls.' Mem. in Opp'n at 23-24.  Section 3.1, entitled "Assumed Liabilities," states that "Purchaser hereby agrees to accept and assume all liabilities related to the operations or conduct of the Business which *arise after the Closing*[.]"  Purchase Agreement § 3.1 (emphasis added).  In Plaintiffs' view, the claims in this lawsuit—which was filed in November 2018—arose after the October 1, 2018 closing, even though the conduct that allegedly gives rise to the claims predates the October 1, 2018 acquisition.  *See* Pls.' Mem. in Opp'n at 23.

But even assuming that Section 3.1 of the Purchase Agreement can be read to mean that Plaintiffs' claims for pre-acquisition wage and hour violations only "arose" after the closing, it is essential to recognize that Mary, New Killamock, James, and Axolotl included a provision in the Purchase Agreement expressly designed to address liability for potential unpaid wage claims

from the time period when New Killamock owned GMR.  Section 3.5 of the Purchase

Agreement, entitled "Employee Matters," provides that

> [o]n or prior to the Closing, Seller will notify all of the employees of the
> Business that the Subject Assets are being sold to Purchaser.  *Seller shall
> be liable to such employees for all wages, benefits, and other obligations
> of any kind whatsoever arising prior to the Closing Date* and Seller hereby
> agrees to indemnify, defend and hold Purchaser harmless from and against
> any and all claims, losses, costs, expenses, judgments and fees, including
> but not limited to reasonable attorneys['] fees in connection with any
> claim made by such employees for all wages, benefits, and other
> obligations of any kind whatsoever arising prior to the Closing Date.

Purchase Agreement § 3.5 (emphasis added).  "[I]t is a fundamental rule of contract construction

that specific terms and exact terms are given greater weight than general language."  *Aramony v.

United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001) (quotation marks omitted).  Therefore,

Section 3.5, which specifically governs the wage and hour claims asserted in this action, must be

given greater weight than the general language in Section 3.1 with respect to the assumption of

liabilities.  The language of Section 3.5 indicates that James and Axolotl were not assuming any

liabilities associated with wage and benefit claims for conduct that took place prior to the closing

date—which includes all of Plaintiffs' claims in this lawsuit.

Alternatively, Plaintiffs maintain that because restaurant employees purportedly were not

notified about the sale of the business—an action that Mary and New Killmallock were required

to take pursuant to Section 3.5 of the Purchase Agreement—James and Axolotl cannot avail

themselves of the protections contemplated by Section 3.5.  *See* Pls.' Mem. in Opp'n at 23.  But

Plaintiffs acknowledge that Section 3.5 did not directly impose any obligations on James or

Axolotl, and Plaintiffs offer no legal support for the proposition that James's "failure" to take an

action that he was not required to take under the terms of the Purchase Agreement should result

in his implied assumption of liabilities, in contravention of a specific provision of the Purchase

Agreement.[12]  At bottom, it would be incongruous to read Section 3.5 of the Purchase

Agreement—a provision designed to limit James/Axolotl's exposure to potential wage claims

that accrued during Mary/New Killmallock's ownership of GMR—as a basis for an implied

assumption of the unpaid wage liabilities of the restaurant from prior to the closing date.

### B.  Fraudulent Transaction

Plaintiffs additionally assert that James and Axolotl should be liable as successors-in-

interest because the transaction between James/Axolotl and Mary/New Killmallock was entered

into fraudulently to avoid liability on Plaintiffs' claims for wage violations.  Pls.' Mem. in Opp'n

at 20-23.  Courts have recognized that direct evidence of fraudulent intent in connection with a

transfer is rare, and therefore, in determining whether a fraudulent conveyance occurred, "courts

will consider 'badges of fraud[,]' which are circumstances that accompany fraudulent transfers

so commonly that their presence gives rise to an inference of intent."  *MFS/Sun Life Tr.-High

Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995); *see also

Kaur v. Royal Arcadia Palace, Inc.*, 643 F. Supp. 2d 276, 290 (E.D.N.Y. 2007) (applying same

standard in case including FLSA and NYLL claims).  Among these "badges of fraud" are: "(1) a

close relationship among the parties to the transaction; (2) a secret and hasty transfer not in the

---

[12] Plaintiffs assert that James/Axolotl and Mary/New Killmallock were "advised of the risk" of non-compliance with Section 3.5 "by their attorney during the sale process." Pls.' Mem. in Opp'n at 23.  The record submitted to the Court does not provide clear support for this statement.  Mary testified that she did not remember Section 3.5 of the Purchase Agreement; that with respect to notifying employees of the sale of GMR to James, "management dealt with all employees at the time"; and that she was "not aware" if Rodriguez notified the employees of the sale of GMR to James.  Mary Depo. at 51:8-52:12.  Mary did not remember discussing Section 3.5 with her attorney, *id.* at 53:6-14, although she remembered that the attorney reviewed the Purchase Agreement with her and James, *id.* at 54:8-10.  Similarly, James testified at his deposition that he did not remember Section 3.5 from when he executed the Purchase Agreement, but that his attorney reviewed it with him.  James Depo. at 19:10-20:3.

usual course of business; (3) inadequacy of consideration; (4) the transferor's knowledge of the creditor's claim and the transferor's inability to pay it; (5) the use of dummies or fictitious parties; and (6) retention of control of the property by the transferor after the conveyance." *MFS/Sun Life Tr.-High Yield Series*, 910 F. Supp. at 935; *see also Kaur*, 643 F. Supp. 2d at 290. "The burden of proving actual intent [to defraud] is on the party seeking to set aside the conveyance," and "[s]uch intent must be demonstrated by clear and convincing evidence." *MFS/Sun Life Tr.-High Yield Series*, 910 F. Supp. at 934, *see also In re Jacobs*, 394 B.R. 646, 658 (Bankr. E.D.N.Y. 2008).  Moreover, "it is the intent of the transferor and not that of the transferee that is dispositive."  *In re Jacobs*, 394 B.R. at 658 (cleaned up).

Plaintiffs point to three purported badges of fraud to attempt to overcome Defendants' summary judgment motion.  First, Plaintiffs assert that there "has been a series of intrafamily transfers of GMR after Fidel incurred IRS tax liability," and that "the only transfers of GMR were through friends and family of Fidel Lira," who is Mary and James's father.  Pls.' Mem. in Opp'n at 21.  Plaintiffs accuse Mary and Fidel of perjury in connection with their testimony about who managed the restaurant while Mary owned it and point to their own testimony that Fidel was the actual owner of GMR.  *Id.*; *see* ECF No. 153 ("El-Hag Aff.") Ex. 4 (Excerpt from Tapia deposition); El-Hag Aff. Ex. 6 (Excerpt from Rodriguez deposition)[13]; El-Hag Aff. Ex. 7 (Excerpt from Garcia-Perez deposition); Tapia Decl. ¶¶ 5-7; Palacios Decl. ¶ 4 (Fidel "was in charge of the operation"); Rodriguez Decl. ¶¶ 3-6.  Additionally, Plaintiffs assert that "Mary bought GMR without negotiating, without having a lawyer, without ever operating or owning a restaurant, without investigating at all," and that "James testified to essentially the same

---

[13] This document was filed on the Court's ECF system with a cover page mislabeled "Plaintiff Exhibit 7."  *See* ECF No. 153-6 at 1.

pattern."[14]  Pls.' Mem. in Opp'n at 22.  While there is no dispute that the transaction between

Mary/New Killmallock and James/Axolotl involved family members, it is entirely unclear what

relevance any of Plaintiffs' arguments regarding prior conveyances from Fidel to Mary or

anyone else have to the transfer of ownership of GMR from Mary/New Killmallock to

James/Axolotl on October 1, 2018, especially since it is the "intent of the transferor," *i.e.*,

Mary/New Killmallock, that is dispositive of the issue of a fraudulent transfer.  Plaintiffs cite no

evidence of Fidel's involvement in the transaction between Mary and James, and they admit that

neither Fidel nor Mary "has held ownership, participated in the day-to-day operations of the

restaurant, or participated in the financial well-being of the restaurant since James Lira purchased

[it]."  Pls.' Resp. to Defs.' 56.1 Statement ¶ 23.  Moreover, even if Plaintiffs' allegations

regarding Fidel's prior alleged transfers were relevant, there is no suggestion that any of those

transfers involved alleged liability for potential unpaid wage claims—rather, Plaintiffs appear to

contend that Fidel transferred the asset to avoid obligations to the IRS.  *See* Pls.' Mem. in Opp'n

at 2, 9, 21; *see also* Rodriguez Decl. ¶ 5; Palacios Decl. ¶ 5.

Second, Plaintiffs assert that the purported inadequacy of the consideration that

James/Axolotl paid for the purchase of GMR is a badge of fraud.  Pls.' Mem. in Opp'n at 22.

But Plaintiffs have not come forward with any evidence to substantiate their argument that the

consideration paid by James/Axolotl was insufficient.  And contrary to Plaintiffs' assertion, it

remains Plaintiffs' burden to establish the inadequacy of the payment—"shifting the burden of

---

[14] As to James's purchase of GMR from Mary, Plaintiffs' argument is overstated—James testified that he had experience working in several different restaurants over the course of ten years prior to purchasing GMR, *see* James Depo. at 17:7-24, and although he testified that he did not investigate GMR's time and payroll practices prior to taking ownership, *id.* at 19:6-9, 47:11-20, he did work in the restaurant for a period of time, *id.* at 23:12-20, reviewed certain financial documents regarding the restaurant's performance, *id.* at 15:24-16:4, and consulted with an attorney in connection with the acquisition, *id.* at 19:23-20:3.

persuasion to an intrafamily transferee is triggered under New York law by the presence of one

of two factors in the conveyance: (1) the absence of any tangible consideration, or (2) a

clandestine transfer of property designed to conceal the nature and value of the consideration."

*United States v. McCombs*, 30 F.3d 310, 326 (2d Cir. 1994).  Here, the parties executed a

Purchase Agreement pursuant to which Axolotl agreed to pay $25,000 upon the closing of the

transaction and provided a $125,000 promissory note to be paid out over five years.  Therefore,

"this is not a case where property was conveyed *without any tangible consideration*."  *McCombs*,

30 F.3d at 326 (emphasis in original).  Further, there is "nothing clandestine about the

conveyance that would justify the placing of an evidentiary burden on [James/Axolotl] to come

forward with evidence exclusively within their control concerning the nature and value of the

consideration."  *Id.*  Plaintiffs know the nature and value of the consideration given for the

purchase of the restaurant, and there is no evidence that the parties tried to conceal the terms of

their agreement.  Accordingly, Plaintiffs bear the burden of showing that James/Axolotl did not

provide fair consideration for the purchase of GMR.

Yet Plaintiffs do not even address the question of what the fair market value of GMR

would be.  Instead, they simply suggest that the consideration given by James/Axolotl was

inadequate because "[i]t is not even clear whether or not James paid Mary the entire purchase

price.  The only evidence is that he gave Mary a deposit of $25,000.00.  There is no evidence

whatsoever that James actually paid Mary the full consideration."  Pls.' Mem. in Opp'n at 22.

But this is nothing more than Plaintiffs trying to shift the burden to Defendants on the issue of

fair consideration.  As set forth in footnote 4, *supra*, Plaintiffs' counsel asked Mary for

information regarding what James actually paid her for GMR, and although Mary's lawyer stated

that they would find out what was and was not paid, no such information or evidence has been

provided to the Court in connection with this motion, and Plaintiffs' counsel has never notified the Court of any issue concerning a failure to produce such information.  Thus, even construing the evidence in the light most favorable to Plaintiffs, Plaintiffs have failed to come forward with any evidence to support their assertion that the consideration given for the purchase of GMR was inadequate.

The third and final badge of fraud cited by Plaintiffs is that Mary/New Killmallock were left insolvent to creditors after the sale of GMR to James/Axolotl.  Pls.' Mem. in Opp'n at 22-23.  The evidence cited by Plaintiffs, however, is a letter dated March 10, 2022, filed on behalf of both Plaintiffs and Settling Defendants in connection with seeking the Court's approval of their settlement, which states that "Mary Lira is judgment proof because she is not domiciled in the United States and has no attachable assets."  *See* El-Hag Aff. Ex. 5.[15]  The letter does not state anything about whether New Killmallock is judgment proof.  *See id.*  Importantly, the

---

[15] The complete explanation provided in the letter is that

> Mary Lira is judgment proof because she is not domiciled in the United States and has no attachable assets.  Between 2014 and 2018, Mary, as the sole shareholder of New Killmallock was the nominal owner of GMR.  However, during that time period she lived in England, where she has resided for more than a decade, and played no role in the management and operation of the restaurant, nor did she receive any income from the restaurant.  In fact, Plaintiff Jose Rodriguez and an individual named Luciana Feijoo, were in charge of GMR's daily operation.  To the extent management decisions were required they were made by Defendant Fidel Lira.

> Based upon the foregoing facts, Plaintiffs believe that Mary has a viable defense to their claims.  Moreover, as noted above, she resides in England, (with her husband who is an Irish citizen and her children who are English citizens) and has no U.S. based assets.  As such, the instant settlement with Mary is in Plaintiffs' best interests.

El-Hag Aff. Ex. 5 at 2.

representation made in the letter regarding the ability to recover a judgment from Mary was based on facts and circumstances that existed *while* Mary was the owner of GMR.  *See id.* at 2 ("Between 2014 and 2018, Mary, as the sole shareholder of New Killmallock was the nominal owner of GMR.  However, during that time period she lived in England, where she has resided for more than a decade, and played no role in the management and operation of the restaurant, nor did she receive any income from the restaurant.").  The letter therefore provides no basis to conclude that Mary and/or New Killmallock were left insolvent to creditors *as a result of* the sale of GMR to James/Axolotl.

Moreover, as noted above, pursuant to the Purchase Agreement, Axolotl agreed to pay New Killmallock $25,000 upon the closing of the transaction and provided a $125,000 promissory note to be paid out over five years.  *See* Purchase Agreement § 2.2 & Ex. B (monthly payments on the note of $2,0833.33 to be paid on the first day of each month from November 1, 2018 through October 1, 2023).  Plaintiffs state in their opposition brief that "[t]he only evidence is that [James] gave Mary a deposit of $25,000.00."  Pls.' Mem. in Opp'n at 22.  But while Plaintiffs dispute payment of the note because "Defendants did not provide any evidence that the note was actually paid," Pls.' Resp. to Defs.' 56.1 Statement ¶ 11, as explained above, this is no more than an attempt to shift the burden of proof to Defendants.  Rather, based on the evidence in the record, it appears that Mary/New Killmallock received $25,000 upon closing on the sale of GMR to James/Axolotl, and, pursuant to the Purchase Agreement, should have been receiving (and should *still* be receiving) payments of over $2,000 per month on the promissory note.  Plaintiffs have failed to present any evidence to the contrary and, therefore, have failed to carry

their burden of establishing that Mary and/or New Killmallock became insolvent to creditors following the closing on the transaction with James/Axolotl. [16]

None of the evidence regarding the supposed "badges of fraud" submitted by Plaintiffs would be sufficient for a reasonable jury to conclude that a fraudulent conveyance occurred in the sale of GMR from New Killmallock to Axolotl.  Prior alleged conduct by Fidel has no particular bearing on the 2018 transaction; Plaintiffs have offered no evidence regarding the fair market value of GMR at the time of the sale or why the purchase price agreed upon by New Killmallock and Axolotl was deficient; and the evidence regarding the financial circumstances of Mary and New Killmallock at the time of the transaction and beyond does not demonstrate insolvency to creditors as a result of the conveyance.

*      *      *      *      *      *

In sum, Plaintiffs have not put forward sufficient evidence to raise a genuine issue of material fact as to successor liability under the New York/traditional common law test, and James and Axolotl cannot be held liable under that framework.  *See Simsbury-Avon Pres. Club, Inc.*, 575 F.3d at 204 ("the nonmoving party must come forward with admissible evidence

---

[16] The Court notes that in approving Plaintiffs' settlement with the Settling Defendants— an outcome jointly requested by all of the parties to that agreement—the Court relied on the representations jointly submitted by counsel to justify the proposed settlement figures.  The Court did not undertake its own independent investigation of the underlying facts, nor could it have done so.  To the extent the evidence that is now before the Court, including the terms of payment to New Killmallock, suggests the possibility that other funds may have been available for Plaintiffs to pursue from any of the Settling Defendants, that information also was available to Plaintiffs via discovery in this action prior to their decision to compromise certain claims and seek judicial approval.  The request for settlement approval also emphasized Mary's viable defense against their claims, in addition to the difficulty of collection from Mary.  In short, Plaintiffs chose to settle with the Settling Defendants based on all of the information available to them regarding their ability to establish their claims in this case, as well as their knowledge that their ability to recover against the remaining defendants would require demonstrating the existence of successor liability.  If Plaintiffs now question their decision to settle, they are free to seek whatever relief they deem appropriate.

sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment"). While the Court will separately consider the applicability of the broader substantial continuity test for purposes of Plaintiffs' FLSA claims, no further analysis is required with respect to Plaintiffs' pre-sale NYLL claims. *See Abumi Sushi*, 262 F. Supp. 3d at 88. Accordingly, Defendants' motion for summary judgment as to Plaintiffs' NYLL claims is GRANTED.

## IV.    The Substantial Continuity Test

Even applying the broader, more liberal "substantial continuity" test, and construing the evidence in the light most favorable to Plaintiffs, James and Axolotl cannot be held liable as Mary and New Killmallock's successors-in-interest.

### A.    Notice

Considering the first indispensable factor of notice, Plaintiffs have not provided any evidence that Defendants had notice either of the lawsuit itself or of the underlying alleged violations of law giving rise to the lawsuit.

First, Defendants could not have had notice of this lawsuit as of the October 1, 2018 closing date of the transaction because the action was not filed until approximately seven weeks later.

Second, Plaintiffs have not presented sufficient evidence to demonstrate that James had actual notice of a potential FLSA claim, either based on his work in the restaurant prior to the closing on the transaction or based on the actions he took upon assuming ownership. When James was explicitly asked whether he changed how the employees were paid upon taking over GMR, he testified, "I couldn't tell you because I don't know how they were paid previously." James Depo. at 42:20-22. James then proceeded to explain how he changed the payroll and time-keeping systems when he took charge, but he specifically testified that in evaluating how

the restaurant operated prior to taking over, he did not have access to any payroll or time-keeping records. *Id.* at 42:23-47:20. Although James testified that he changed the time-keeping system because the one that had been in use was old and outdated, *id.* at 43:8-44:18, that does not demonstrate either that employees' time was not being properly recorded or that James was on notice that employees' time was not being properly recorded. And although James testified that he opened a new payroll account with ADP because it was the payroll company that he had used at his previous job and he was "familiar" with it and "was used to that," *id.* at 43:1-7, 45:9-12, GMR had previously used ADP as well, *id.* at 44:19-46:1. Moreover, contrary to Plaintiffs' assertion, there is no evidence that any employee ever complained about improper pay practices during the time that James was working at GMR before he became the owner. *See* footnote 6, *supra*. Nothing in James's deposition testimony, or anywhere else in the record, is sufficient to establish that James had actual notice of any potential FLSA claims or payroll violations. *See Abumi Sushi*, 262 F. Supp. 3d at 93 ("Plaintiff does not explain how merely being at the Restaurant as a prospective buyer of assets would have informed [the buyer] of the predecessors' payment practices. In addition, [the buyer] testified that he did not know how much the predecessors had paid their employees. . . . *In the absence of any concrete evidence* that the Appearing Defendants had pre-sale knowledge of any wage and hour violations, the Court concludes that Plaintiff has failed to create a triable issue of fact as to whether they had such notice . . . .") (emphasis added).

Plaintiffs' primary contention in support of notice is that James/Axolotl had constructive notice of Plaintiffs' claims. *See* Pls.' Mem. in Opp'n at 14-16. As one district court explained,

> [t]o show a buyer was constructively on notice of FLSA violations, it is
> not enough to merely demonstrate that it could have discovered such
> violations with the exercise of additional diligence. Instead, a plaintiff, as
> a general matter, must point to the existence of certain "red flags"—such

as a suspiciously good deal or an uncharacteristically quick closing—that would have put a reasonable buyer on notice that it should inquire further into the circumstances of the transaction.

*Li v. New Ichiro Sushi, Inc.*, No. 14-cv-10242 (AJN), No. 15-cv-414 (AJN), 2020 WL 2094095, at *6 (S.D.N.Y. Apr. 30, 2020), *aff'd*, 2021 WL 6105491 (2d Cir. Dec. 21, 2021) (summary order).

Here, Plaintiffs point to a number of supposed red flags that they maintain give rise to a genuine issue of material fact as to whether James had constructive notice of FLSA violations. First, James used the same accountant as Mary, and the accountant, Rosanna Bell, stated that she did not provide James with any payroll information or "financial arrangements of the restaurant" from the time it was owned by Mary. *See* Pls.' Mem. in Opp'n at 15; Bell Decl. ¶ 3. Second, James and Mary used the same lawyer to complete the transaction, and rather than placing GMR on the open market for bidding, the lawyer allegedly determined the purchase price for the restaurant. Pls.' Mem. in Opp'n at 15.[17] Third, James allegedly performed no meaningful investigation of GMR's operations prior to making the purchase. *Id.* None of these alleged red flags is sufficient to create a genuine issue of material fact as to whether James had constructive notice of FLSA violations.

---

[17] Although James testified that to his knowledge, Mary was not considering any other possible buyers, and he did not bid against anyone else when buying GMR, James Depo. at 21:6-12, he also testified that there *was* a negotiation concerning the purchase price for the restaurant, *id.* at 23:6-8, but he did not state, and was not asked, with whom he negotiated. Plaintiffs dispute that there was such a negotiation, citing Mary's deposition testimony, *see* Pls.' Resp. to Defs.' 56.1 Statement ¶ 12, but the deposition testimony they cite does not support their challenge to James's testimony. Mary testified only that determination of the sales price "was all dealt with by the lawyer," Mary Depo. at 38:21-23, and when asked again whether "the lawyer came up with the sale price," Mary responded, "I don't recall at the time on sale price," *id.* at 39:18-21. Even if the record is unclear on this point, it is immaterial to the Court's analysis since, as set forth, *infra*, Plaintiffs fail to provide evidence that the purchase price was suspiciously low.

The fact that James did not obtain or review financial or employment records from the accountant is not itself a red flag, even if the only documents that James reviewed prior to completing the transaction were GMR's tax returns and profit and loss statements. Failing to review these records may have been a failure of due diligence in the face of an existing red flag, but again there is no evidence of actual notice regarding FLSA violations. As one district court explained in a case finding a lack of constructive notice:

> [T]he record reflects, as noted above, that [the seller co-defendant] assured the Buyer Defendants prior to the sale that the business was in compliance with all laws and was debt-free. The evidentiary proffers indicate that [the buyers] asked only about the business's income, and the asset purchase agreement includes [the seller's] warranty that there were no unsatisfied pending lawsuits, judgments, or legal obligations associated with the business. . . . Plaintiff points to no attributes of the sale that would have reasonably alerted the Buyer Defendants that an investigation of KSLC's labor practices was warranted. In fact, the Buyer Defendants received assurances that KSLC had complied with applicable laws and had no unsatisfied claims pending against it.

*Diaz*, 2018 WL 4935831, at *5. Here, too, James looked only at GMR's tax returns and profit and loss statements, and the Purchase Agreement states that "Seller has no judgments, liens, actions, decrees, attachments, orders or proceedings pending against it in any Court which would be a lien on the Subject Assets transferred hereunder." Purchase Agreement § 5.1.3. Although New Killmallock's tax returns for 2017 and 2018 show small losses in business income of $2,684 and $9,022, respectively, *see* El-Hag Aff. Ex. 9, Plaintiffs do not explain why these small losses amount to a red flag that should have prompted James to investigate, or that put him on constructive notice of, possible wage violations by Mary/New Killmallock.

The fact that both parties to the transaction used the same lawyer to complete the sale of GMR is not itself a red flag. *See Li*, 2020 WL 2094095, at *6 ("Plaintiffs only argue that: the sale of assets from Ichiro to New Ichiro was conducted in cash, with one lawyer representing the

buyer and the seller, and that New Ichiro Sushi did not retain employment records of Ichiro

Sushi. . . .  While this transactional arrangement may have been unusual, Plaintiffs fail to identify

why this would constitute a 'red flag' that should have put New Ichiro on constructive notice of

labor violations.").  And even setting aside James's testimony that the purchase price actually

was negotiated, *see* footnote 17, *supra*, Plaintiffs again have failed to present any evidence to

suggest why having the lawyer set the purchase price amounts to a red flag.  If Plaintiffs mean to

suggest that the price could be considered suspiciously low because the lawyer set the price

without putting the restaurant on the market, Plaintiffs, who bear the burden of proving

constructive notice, again have failed to present any evidence regarding the fair market value of

GMR at the time of the sale to support the contention that the $150,000 purchase price was

problematic.  *See Abumi Sushi*, 262 F. Supp. 3d at 93 ("Plaintiff argues that the $35,000 price

that the Appearing Defendants paid for the assets was 'conspicuously low' because it was only

half of the yearly rent for the premises. . . . But Plaintiff provides no evidence that such a ratio

between the yearly rent and the purchase price of the assets in question here is suspicious or

otherwise unexpected.").

     Finally, James's failure to investigate GMR's operations more thoroughly prior to

making the purchase is not itself a red flag.  This Court declines to impose an open-ended duty to

investigate all possible issues prior to a purchase of assets and instead adopts the reasoning of the

district court in *Abumi Sushi*.  There, the court stated that "[t]o the extent that Plaintiff asks the

Court to impose a duty on purchasers to engage in due diligence without respect to the size of the

transaction and even in the absence of any red flags in order to avoid being burdened with a

predecessor's FLSA liabilities, the Court declines."  *Id.*  Indeed, the court rejected the plaintiff's

"expansive reconstruction of the concept of constructive notice" in which "a purchaser of assets

[is deemed to have] constructive notice of all violations of law by a business the assets of which are sold in an asset sale whenever those violations could have been ascertained through the exercise of reasonable due diligence" because that "would risk subjecting nearly every innocent purchaser to trial on the issue of the reasonableness of its diligence efforts." *Id.* at 94; *see also Diaz*, 2018 WL 4935831, at *5 (adopting the rationale of *Abumi Sushi* "that to impose a general duty of due diligence in the absence of facts suggestive of a predecessor's culpable conduct would render the notice prong of the substantial continuity inquiry practically meaningless"). This Court similarly rejects Plaintiffs' generalized assertion that James's failure to investigate GMR's operations—in the absence of any red flags—supports a finding of constructive notice.

In sum, none of the alleged red flags cited by Plaintiffs are actual red flags that should have either led James to investigate further into possible wage violations, or put James on constructive notice of such violations by Mary/New Killmallock. *See Diaz*, 2018 WL 4935831, at *5 ("Here, Plaintiff points to no attributes of the sale that would have reasonably alerted the Buyer Defendants that an investigation of [the Seller's] labor practices was warranted."). Plaintiffs' failure to raise a genuine issue of material fact with respect to the indispensable factor of notice critically undermines their assertion of successor liability. *See Abumi Sushi*, 262 F. Supp. 3d at 95 ("[T]he Appearing Defendants' lack of notice of potential liability is by itself an example of a reason to withhold successorship liability.") (cleaned up).

### B.      Ability of the Predecessor to Provide Relief

With respect to the second indispensable factor of the predecessor's ability to provide relief, Plaintiffs maintain that the Court should find that Mary and New Killmallock cannot provide relief based on the representation in the parties' joint letter submitted in connection with the Court's approval of the settlement between Plaintiffs and the Settling Defendants. *See* Pls.'

Mem. in Opp'n at 16-17.  As detailed above, the letter states that Mary is "judgment proof because she is not domiciled in the United States and has no attachable assets," El-Hag Aff. Ex. 5, but says nothing about New Killmallock.  But Plaintiffs cannot use the letter to attempt, once again, to avoid their burden of proof on the issue of successor liability.

As noted above, the representation made in the letter regarding the ability to recover a judgment from Mary was based on facts and circumstances that existed *while* Mary was the owner of GMR, and it ignores the fact that even after the sale, New Killmallock was an asset that Mary had in the United States.  Plaintiffs provide no legal support for the proposition that an individual predecessor's inability to provide relief is established, as a matter of law, whenever the individual predecessor, who owns the predecessor corporation, has no assets in the United States other than his or her interest in the corporation.  And there is no evidence that the corporate entity in this case—New Killmallock—is judgment proof.

In opposing this motion, Plaintiffs have failed to come forward with any evidence to refute the evidence that $25,000 was paid to New Killmallock at the closing on the sale of GMR and that Axolotl was obligated to make monthly payments to New Killmallock on the $125,000 promissory note, starting on November 1, 2018, through October 1, 2023.  Plaintiffs have presented no evidence to suggest that Axolotl has not made and/or that New Killmallock has not received the installment payments on the note.  It would therefore appear that New Killmallock has attachable assets.  *See Abumi Sushi*, 262 F. Supp. 3d at 95 (rejecting the argument that the sale of the corporate seller's assets and its subsequent dissolution "necessarily renders [it] unable to provide relief"); *cf. Diaz*, 2018 WL 4935831, at *5 ("In light of the undisputed facts that KSLC still had a right to the balance of the purchase price as of the filing of this action and that the monthly payments had been made regularly, Plaintiff, who has the burden of demonstrating

that recovery from the predecessor is unlikely, has not even raised a triable issue of fact as to whether KSLC is unlikely to be able to provide adequate relief.").  Plaintiffs have consequently failed to raise a genuine issue of material fact regarding Mary and/or New Killmallock's ability to provide relief to Plaintiffs.

* * * * * * * * * *

In sum, because they cannot point to sufficient evidence as to either of the two most important factors of the substantial continuity analysis, Plaintiffs cannot satisfy the substantial continuity test for establishing successor liability, and James and Axolotl cannot be held liable under that framework.  *See Simsbury-Avon Pres. Club, Inc.*, 575 F.3d at 204 ("the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment").  Accordingly, Defendants' motion for summary judgment as to Plaintiffs' FLSA claims is GRANTED.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 144) is GRANTED, and the action is dismissed with prejudice.  The Clerk of Court is respectfully directed to enter judgment in favor of Defendants James Lira, Guadalajara Mexican Restaurant, and Axolotl Ltd., and close this case.

Dated: March 31, 2023
       White Plains, New York

                                    SO ORDERED.

                                    _____
                                    ANDREW E. KRAUSE
                                    United States Magistrate Judge